# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### CENTRAL DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

LARRY RAYMOND KLING,

        Defendant.

No. CR06-3007-MWB

**REPORT AND RECOMMENDATION
ON MOTIONS TO SUPPRESS**

_____

On February 9, 2006, the grand jury returned a two-count Indictment against the defendant Larry Raymond Kling. In Count 1, Kling is charged with using, persuading, and inducing a person under the age of eighteen to engage in sexually-explicit conduct for the express purpose of producing visual depictions of that conduct, "namely four (4) TDK videotapes, which had previously been transported in interstate and foreign commerce," in violation of 18 U.S.C. § 2251(a). (Doc. No. 1) In Count 2, Kling is charged with possession of the four videotapes, in violation of 18 U.S.C. § 2252A(a)(5)(B). (*Id.*)

This matter is before the court on three motions to suppress evidence (Doc. Nos. 32, 34, & 36) filed by Kling. Pursuant to the trial management order (Doc. No. 11), which assigned motions to suppress to the undersigned for hearing and the filing of a report and recommended disposition, the court held an evidentiary hearing on the motions on July 6, 2006, at which Assistant U.S. Attorney Sean Berry appeared on behalf of the plaintiff (the "Government"), and Kling appeared in person with his attorney, F. David Eastman. The Government offered the testimony of FBI Special Agent David Larsen, and Eagle Grove, Iowa, Police Chief Thomas F. Anderson (who testified by phone). Kling offered the testimony of Kasey Pickett, and also testified on his own behalf.

The following exhibits were admitted into evidence: Gov't Ex. 1, search warrant application, search warrant, and all attachments (attached as Ex. 1 to Doc. No. 41); Gov't

Ex. 2, photographs; and Gov't Exs. 3A, 3B, 3C, 3D, 3E(1), and 3E(2), video recordings on DVD. The court ordered all exhibits except Gov't Ex. 1 to be **sealed**. Subsequent to the hearing, with the court's permission, Kling submitted an Affidavit to which he attached the originals of what he contends are the only documents given to him by agents at the time of the search of his residence. The court marked Kling's original Affidavit and its attachments as **Def. Ex. A**, and placed the original documents in the Clerk's file.

The court has considered the evidence and the parties' briefs and arguments, and turns to consideration of the three motions to suppress. The court first will address Kling's third motion to suppress (Doc. No. 36). The court then will make factual findings relevant to Kling's first and second motions to suppress, followed by a discussion of those motions.

## *KLING'S THIRD MOTION TO SUPPRESS*

Kling's third motion to suppress (Doc. No. 36) is tantamount to a motion in limine. In the motion, Kling asks the court to prevent the Government from introducing at trial certain explicit movies and photographs of the victim that were seized during the search of Kling's residence. Kling offers to stipulate that he took the explicit photographs and movies, and they "show the alleged victim in a state of undress and engaging in sex acts with [Kling]." (Doc. No. 36-1, p. 1; Doc. No. 36-2, p. 3) Kling argues this should be "sufficient for the government's purposes in this case." (Doc. No. 36, pp. 1-2)

Kling makes much of the fact that he allegedly believed the victim was sixteen years of age at the time of his sexual relationship with her. He argues she therefore would have been over the age of consent under both Iowa and federal law to engage in a sexual relationship with him. He asserts that if the jury sees the explicit photographs and movies, the jury will be unable to put aside their personal feelings about a sexual relationship between Kling and the much younger victim in order to determine whether Kling actually broke the law. He therefore argues the evidence is more prejudicial than probative, and

he seeks exclusion of the photographs and movies pursuant to Federal Rule of Evidence 403. (*See* Doc. No. 36-2, and cases cited therein)

The Government does not accept Kling's offer to stipulate to the existence, origin, and content of the photographs and movies. The Government notes Kling has not been charged with simply engaging in sexual acts with the victim, or even with simply making the photographs and videotapes of their sex acts. Rather, Kling has been charged with inducing the victim to engage in sex acts for the express purpose of producing the visual depictions of those acts. The Government argues this is evidenced by, "among other things, the victim's poses in the still pictures, [Kling's] conduct with the victim as shown [in] the videotapes, the position of the camera during the making of the videotapes, and the starting and ending point of the tapes." (Doc. No. 42, p. 4) The Government argues that under the Rule 403 balancing test set forth by the United States Supreme Court in *Old Chief v. United States*, 519 U.S. 172, 117 S. Ct. 644, 136 L. Ed. 2d 574 (1997), the probative value of the evidence outweighs any danger of unfair prejudice to Kling. The Government further argues there are no satisfactory evidentiary alternatives.

As the Eighth Circuit Court of Appeals has noted, the mere fact that evidence is prejudicial does not mean it must be excluded. "In fact, no verdict could be obtained without prejudicial evidence." *United States v. Noland*, 960 F.2d 1384, 1387 (8th Cir. 1992). Given the nature of the charges against Kling, the undersigned finds no merit to his argument. The court finds the evidence's probative value outweighs any danger of unfair prejudice to Kling. The undersigned therefore recommends Kling's motion to exclude the photographs and movies be denied.

## *BACKGROUND FACTS*

The court makes the following findings of fact that are relevant to Kling's first and second motions to suppress (Doc. Nos. 32 & 34). On January 19, 2006, FBI agents David Larsen and Traci Dow-Wyatt went to the Eagle Grove, Iowa, Police Department to discuss the pending execution of a search warrant at Kling's residence. The FBI agents were seeking the least obtrusive method to gain entry into Kling's residence for purposes of executing the warrant. Eagle Grove Police Chief Thomas Anderson stated he was Kling's neighbor, and he offered to assist the agents. Chief Anderson walked across the street from City Hall to Kling's place of employment. He told Kling he would like to speak with him, and asked if Kling had a moment to step across the street to City Hall. Kling agreed, and he and Chief Anderson walked back over to City Hall.

Kling was met at City Hall by the two FBI agents, who displayed their identification and held up the search warrant. They advised Kling they had a warrant to search his residence, and asked if he would unlock the door to admit them so they would not have to enter the residence forcibly. Kling agreed to open the residence. The agents told Kling that either they would drive him to the residence, or he could drive his own vehicle but he would have to be accompanied by an agent to ensure he did not attempt to gain access to his home computer remotely. Kling drove his vehicle to his residence, accompanied by Agent Dow-Wyatt. The drive from City Hall to Kling's residence took approximately three minutes. When they arrived at the residence, Kling unlocked the door. The agents then asked him to wait outside while they did a protective sweep of the residence. Two other agents were already at the house waiting to begin the search, and a uniformed Eagle Grove officer also was present at the scene. After the agents completed the protective sweep of the house, Kling went inside with Agents Larsen and Dow-Wyatt, while the other two agents began the search of the residence. The Eagle Grove officer waited by the front door.

The agents asked Kling if he would mind answering some questions, and Kling agreed to do so. He and the agents sat down in the living room, where the agents proceeded to question Kling for about ninety minutes. Kling did not volunteer information, but he responded to all questions the agents asked of him. During the interview, Kling asked for, and received, permission to smoke, to go to the bathroom, and to get a cold drink from the kitchen. No one accompanied Kling when he went to the bathroom or to the kitchen. Throughout much of the interview, a uniformed Eagle Grove officer stood next to the front door of the residence.

It is undisputed that while the agents were at Kling's residence, he was never arrested or placed in handcuffs, no officer ever drew a weapon, and no officer ever advised Kling of his *Miranda* rights.

When the agents finished searching Kling's residence, all of the FBI agents and local officers left the residence, while Kling remained behind in his home. Agent Larsen left a copy of the warrant at Kling's residence. Kling claims Agent Larsen only left a copy of the first page of the warrant, with none of the attachments that identified what property the agents were allowed to search or to seize, and a carbon copy of a receipt for property seized at the residence. (*See* Def. Ex. A) Agent Larsen disputes Kling's allegation, and testified he left a complete copy of the search warrant, including all attachments and a copy of the application for the warrant. It is undisputed that Kling never asked to see a copy of the warrant.

According to the agents, they implied throughout the interview that Kling was free to return to work if he wanted to, although no officer expressly told Kling he did not have to answer questions or he was free to leave. When Kling asked if he could go to the bathroom or get a cold drink, they responded with something like, "Sure, it's your house." Agent Larsen said that at one point near the end of the interview, Kling made a statement that he would offer the agents a beer, but he knew they were "on the clock." Agent

Larsen testified the agents made it clear they were asking for Kling's cooperation, rather than directing him to respond to questions.

Kling tells a different story. He testified he did not feel free to leave his residence. He stated a uniformed officer stood by the door throughout the interview, there were two agents sitting with him, and two agents were searching his house. He felt intimated, to the point that he believed it was necessary to ask permission before he left the room to go to the bathroom or the kitchen.

## KLING'S FIRST MOTION TO SUPPRESS

In his first motion to suppress (Doc. No. 32), Kling seeks to suppress any statements he made to law enforcement during the execution of the search warrant at his residence. Kling argues he was subjected to a custodial interrogation at his residence, in violation of his rights under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). In *Miranda*, the United States Supreme Court ruled that law enforcement officers must, prior to beginning any interrogation, inform a suspect in their custody of his right not to incriminate himself and his right to an attorney. *Miranda*, 384 U.S. at 444, 86 S. Ct. at 1612. An interrogation encompasses direct questioning as well as the functional equivalent of interrogation, as tested objectively; *i.e.*, "any words or actions on the part of the police (other than those normally attended to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301, 100 S. Ct. 1682, 1689-90, 64 L. Ed. 2d 297 (1980); *accord United States v. Hatten*, 68 F.3d 257, 261 (8th Cir. 1995). Whether a suspect is "in custody" at the time of questioning is a mixed question of law and fact which the courts resolve using a totality-of-circumstances approach. *United States v. Griffin*, 922 F.2d 1343, 1347 (8th Cir. 1990) (citing *United States v. Carter*, 884 F.2d 368, 370 (8th Cir. 1989)).

To be "in custody," the person being questioned either must have been arrested formally, or his freedom of action must have been deprived in a significant way. *Miranda*, 384 U.S. at 444, 86 S. Ct. at 1612. The test is what a reasonable person in Kling's position would have believed about his situation. *See Berkemer v. McCarty*, 468 U.S. 420, 442 & n.5, 104 S. Ct. 3138, 3151 & n.5, 82 L. Ed. 2d 317 (1984) (citing *Beckwith v. United States*, 425 U.S. 341, 96 S. Ct. 1612, 48 L. Ed. 2d 1 (1976)).

Viewing the totality of the circumstances, the undersigned finds a reasonable person in Kling's situation would not have believed he was in custody, nor would he have felt compelled to answer questions. The court finds credible Agent Larsen's testimony that the agents asked Kling if he would mind answering some questions, and Kling voluntarily did so. The court therefore recommends Kling's motion to suppress statements he made to officers during execution of the search warrant be denied.

## *KLING'S SECOND MOTION TO SUPPRESS*

In his second motion to suppress (Doc. No. 34), Kling seeks to suppress all of the evidence seized by officers during the search of his residence. Kling argues the search warrant was not based on probable cause. Specifically, he notes the information FBI agents obtained that led to their search warrant application was provided by Yahoo, an Internet Service Provider ("ISP"). He argues the warrant application contained no statements or affidavits to corroborate this information, and the magistrate judge who reviewed the warrant application was not given any information regarding the reliability of the informant providing the information. Kling further argues that even if Yahoo's credibility was not in issue, the information only provided probable cause to search his computer, not his entire residence. He argues the evidence contained in the discovery file indicates the information from Yahoo suggested certain images had been uploaded to

Kling's computer, but no evidence in the discovery file or the warrant application suggests illegal images existed in any other form.

In reviewing a judge's determination of probable cause to issue a search warrant, the court's task "is simply to ensure that the magistrate judge had a substantial basis for concluding that probable cause existed." *Illinois v. Gates*, 462 U.S. 213, 238-39, 103 S. Ct. 2317, 2332, 76 L. Ed. 2d 527 (1983). "A magistrate's "'determination of probable cause should be paid great deference by reviewing courts.'" *Id.*, 462 U.S. at 236, 103 S. Ct. at 2331 (quoting *Spinelli v. United States,* 309 U.S. 410, 419, 89 S. Ct. 1509, 590, 21 L. Ed. 2d 637 (1969)). The *Gates* Court explained:

> Reflecting this preference for the warrant process, the tradi-
> tional standard for review of an issuing magistrate's probable
> cause determination has been that so long as the magistrate had
> a "substantial basis for . . . conclud[ing]" that a search would
> uncover evidence of wrongdoing, the Fourth Amendment
> requires no more. *Jones v. United States*, 362 U.S. 257, 271,
> 80 S. Ct. 725, 736, 4 L. Ed. 2d 697 (1960). *See United States
> v. Harris*, 403 U.S. 573, 577-583, 91 S. Ct. 2075, 2079-2082,
> 29 L. Ed. 2d 723 (1971). [FN10]
>
>> [FN10] We also have said that "Although in a
>> particular case it may not be easy to determine
>> when an affidavit demonstrates the existence of
>> probable cause, the resolution of doubtful or
>> marginal cases in this area should be largely
>> determined by the preference to be accorded to
>> warrants," *Ventresca*, *supra*, 380 U.S. at 109,
>> 85 S. Ct. at 746. This reflects both a desire to
>> encourage use of the warrant process by police
>> officers and a recognition that once a warrant
>> has been obtained, intrusion upon interests
>> protected by the Fourth Amendment is less
>> severe than otherwise may be the case.

*Gates*, 462 U.S. at 237 & n.10, 103 S. Ct. at 2331 & n.10.

Notably, even if the warrant was not supported by probable cause, if the officers executing the warrant reasonably and in good faith relied on the warrant, then evidence obtained from the search should not be suppressed. *United States v. Leon*, 468 U.S. 897, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984). The officers' reliance on the warrant must have been objectively reasonable; the *Leon* good faith exception may not apply if the affidavit supporting the warrant application was a "bare bones" affidavit that obviously did not provide a sufficient basis to issue the warrant. *See Leon*, 468 U.S. at 914-15, 104 S. Ct. at 3416.

In this case, the warrant application contained a detailed account of the information the agents received from Yahoo and other ISPs. To summarize the affidavit's contents briefly, Yahoo, Inc. made a report to the National Center for Missing and Exploited Children that an individual using a specific e-mail address had uploaded or transmitted images believed to be child pornography to a particular Yahoo group. Administrative subpoenas were served on Yahoo for information concerning the Yahoo group in question, and for account information related to the specified e-mail address. The e-mail address was tracked back through an e-mail provider and an ISP that ultimately identified the account holder using the specified e-mail address as Kling. The affidavit went on to specify how the agents had located and verified the residence at which Kling was living and receiving Internet services.

Kling complains that the affidavit does not specify the identity of the original informant who provided the information from Yahoo, or give information concerning that person's reliability. The affidavit lists the original informant as the corporation Yahoo, Inc. The court has found no case, and Kling cites none, to support the proposition that information received from an Internet Service Provider may be suspect unless the veracity of the specific individual who provides the information is supported in the warrant application. Courts routinely consider information provided by ISPs and e-mail providers

just as they consider information provided by financial institutions, credit card issuers, and utility companies. *See, e.g.*, *United States v. Wagers*, ___ F.3d ___, 2006 WL 1735574 (6th Cir. June 27, 2006) (considering information provided by AOL and other e-mail providers in finding probable cause to search defendant's home and office); *United States v. Fazio*, 2006 WL 1307614, slip op. (E.D. Mo. May 9, 2006) (relying on information from Yahoo similar to that offered in the warrant affidavit in this case, discussing the individuality and identifiability of a computer's IP address); *United States v. Martin*, 426 F.3d 83 (2d Cir. 2005) (holding that merely subscribing to a particular e-group was sufficient to support a finding of probable cause). Except in unusual circumstances, courts do not require information regarding the credibility of a records custodian or other company employee who verifies business records. What the agents received from Yahoo was just that --business records of who had accessed a Yahoo group and what those individuals had uploaded or downloaded from the group's site.

The court finds no merit in Kling's argument that the warrant affidavit could not support a probable cause finding because it failed to identify the individual Yahoo employee who provided the original information about pornographic photographs being uploaded to or downloaded from the site. The court further finds the warrant application contained ample probable cause to support a search warrant for Kling's computer and his residence. The affidavit in support of the warrant application details, from the agent's training and experience, the many ways in which an individual may collect, possess, and distribute images of child pornography. Some of these methods involve the possession of photographs and videotapes of pornographic acts. The search warrant was limited in scope to records and materials evidencing the receipt, storage, creation, possession, or dissemination of pornographic images of minors. The information in the affidavit provided a reasonable nexus between the items that were the subject of the search and Kling's residence, not just his computer.

The probable cause determination requires a "practical, common-sense decision whether, given all the circumstances set forth in the affidavit, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular case." *Gates*, 462 U.S. at 238, 103 S. Ct. at 2332. Such a "fair probability" was readily apparent from the information provided in the affidavit here. Kling has failed to show the warrant was lacking in probable cause, and his motion to suppress on this basis should be denied. Alternatively, the court finds the officers' reliance on the warrant was reasonable and in good faith, and the evidence should not be suppressed pursuant to *Leon*.

Kling further argues the evidence should be suppressed because the agents violated Federal Rule of Criminal Procedure 41(f)[1] when they failed to provide him with a complete copy of the search warrant prior to initiating the search. According to Kling, even after the search was completed, the agents failed to provide him with a complete copy of the search warrant, including attachments that identify the property to be searched and list the items that may be seized. Kling contends the agents gave him copies of only the face page of the search warrant, a blank return page, and a two-page inventory of items seized from his residence. (*See* Def. Ex. A) Kling relies on *United States v. Gantt*, 194 F.3d 987 (9th Cir. 1999), in which the court held, "A warrant served after the search is completed cannot timely 'provide the property owner with sufficient information to reassure him of the entry's legality.'" *Id.* at 991 (quoting *Michigan v. Tyler*, 436 U.S. 499, 508, 98 S. Ct. 1942, 1949, 56 L. Ed. 2d 486 (1978)).

The court is unable to determine from the documents submitted by Kling whether Agent Larsen is correct in stating he also left a copy of the warrant's attachments and the warrant application with Kling. However, for purposes of this discussion, the court finds

---

[1]Rule 41(f), in pertinent part, requires the officer executing a search warrant to "give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken; or . . . leave a copy of the warrant and receipt at the place where the officer took the property." Fed. R. Crim. P. 41(f)(3).

it is unnecessary to determine exactly what documents were left in Kling's possession because even if Kling's version of the events is fully credible, the agents' failure to provide him with a copy of the warrant's attachments still would not warrant suppression. While the court agrees that providing the warrant at the outset of the search may be the preferable practice, the court does not need to reach the question of whether the agents' actions here violated Rule 41(f). Even in *Gantt*, the court recognized that unless the Rule has been disregarded deliberately, or unless the defendant can show prejudice, a violation of Rule 41 does not require suppression of the evidence. *See id.*, 194 F.3d at 1005; *see also Groh v. Ramirez*, 540 U.S. 551, 562 n.5, 124 S. Ct. 1284, 1292 n.5, 157 L. Ed. 2d 1068 (2004) (noting "neither the Fourth Amendment nor Rule 41 . . . requires the executing officer to serve the warrant on the owner before commencing the search"); *United States v. Hepperle*, 810 F.2d 836, 839 (8th Cir. 1987) (same, citing cases).

The evidence here shows the agents held up the warrant when they first met Kling, and later left the warrant at Kling's residence. Kling never asked to see the warrant in any event, so he cannot argue he was prejudiced in any way by the agents' failure to provide him with the warrant prior to the search. Kling has failed to show the agents deliberately disregarded the requirements of Rule 41(f), or that he was prejudiced by the agent's failure to give him the warrant prior to initiating the search. His motion to suppress on this basis should be denied.

## CONCLUSION

Kling has failed to show that either his statements or the physical evidence seized during the search of his residence should be suppressed. He further has failed to show the prejudicial effect of the photographs and movies would outweigh their probative value in this case. For these reasons,

**IT IS RESPECTFULLY RECOMMENDED**, unless any party files objections to this Report and Recommendation as set forth herein, that Kling's first, second, and third

motions to suppress be denied.  Objections must be filed by **July 20, 2006**.  Responses to objections, if any, must be filed by **July 24, 2006**.

> **IMPORTANT NOTE:** Any party planning to lodge objections to this Report and Recommendation must order a transcript of the hearing promptly (in any event not later than Friday, July 14, 2006), **<u>regardless of whether the party believes a transcript is necessary to argue the objection</u>**.  If an attorney files an objection to this Report and Recommendation without having ordered the transcript as required, then the court may impose sanctions on the attorney.

**IT IS SO ORDERED.**

**DATED** this 12th day of July, 2006.

_____
PAUL A. ZOSS
MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT